**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>NAJEE BRANTLEY,<br><br>           Defendant. | Crim. Action No. 19-00092 (SDW)<br><br>**OPINION**<br><br>May 13, 2021 |

**WIGENTON**, District Judge.

Before this Court is Defendant Najee Brantley's ("Brantley" or "Defendant") Motion to Suppress Evidence (the "Motion") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). (D.E. 37.) For the reasons discussed below, the Motion is **DENIED**.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

Defendant is charged with possession of a firearm and intent to distribute a controlled substance in violation of 18 U.S.C. § 922(g)(1), 18 U.S.C. § 924(c)(1)(A)(i), and 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (D.E. 25 at 1–3.) On July 8, 2020, Defendant filed the instant Motion, arguing that evidence was improperly seized during his arrest, including a Gucci fanny pack (the "Bag") that contained a gun, ammunition, and heroin. (D.E. 37 at 4.)

This Court, writing for the parties, assumes familiarity with the history of this matter and addresses only those facts relevant to deciding the present Motion. The parties do not dispute that, on July 26, 2018, the Paterson Police Department ("PPD") "received an anonymous call about Brantley, who was wanted on multiple arrest warrants." (D.E. 41 at 1; D.E. 37 at 4.) The

anonymous caller "identified Brantley by name as having been involved in recent shootings," "told the police that Brantley currently was at [a woman named Bahjane Reels'] Paterson apartment," and stated that "Brantley had a handgun that was inside a Gucci fanny pack." (D.E. 41 at 1.) After confirming the outstanding warrants, but without obtaining a search warrant, PPD detectives went to Ms. Reels' apartment to arrest Defendant. (*Id*.) After entering the apartment, the detectives located Defendant in his underwear under Ms. Reels' bed. (*Id.* at 1–2.) In the process of locating Defendant's clothes, a detective recovered the Bag, which was brought to the PPD station and searched. (*Id.* at 2.)

Defendant's Motion contends that the Bag's seizure at the apartment, and subsequent search at the station, exceeded the lawful bounds of the arrest warrant and violated his rights under the Fourth Amendment. (*See* D.E. 37 at 5.) On August 7, 2020, the United States of America (the "Government") initially opposed the Motion on the basis that Defendant lacked standing to challenge a search, because he was merely a short-term guest at the apartment. (D.E. 41 at 8.) In the alternative, the Government argued that the Bag was properly confiscated because the detectives had probable cause to enter the apartment and the gun was able to be perceived by touch and sight according to the "plain view" and "plain feel" doctrines. (*Id.* at 12, 14.)

According to the Government's initial narrative, when the detectives arrived, Ms. Reels answered the door, told them to wait for a minute, and left the door ajar. (*Id*. at 5–6.) After hearing "movement within," the detectives "entered the apartment" through the open door, walked into "Reels' bedroom," and "found Brantley hiding beneath Reels' bed in his underwear." (*Id*. at 1–2.) After handcuffing Defendant, the detectives were allegedly "directed" by Brantley to his clothing, at which point a detective "picked the clothes up" and "also inadvertently picked up a Gucci fanny pack" that was beneath the clothes, in which "the contours of a gun" could be felt and

a "firearm" could be seen. (*Id*. at 5–7.) After locating the Bag, the "detective seized the weapon, which was loaded with eight rounds of ammunition," and subsequently conducted an "inventory search of the fanny pack," which located heroin. (*Id*. at 2.) Defendant replied on October 9, 2020, arguing that, as an overnight guest at Ms. Reels' apartment, he had standing to raise his claims. (D.E. 45.)

On December 24, 2020, the Government filed a supplemental letter—purporting to "advise the Court of additional information" regarding Defendant's arrest—that significantly altered its theories for how and why the seizure of the Bag was appropriate. (D.E. 48.) In the letter, the Government acknowledged that its briefing had relied on a flawed Incident Report, written by PPD Detective Eddial Lugo ("Detective Lugo"), and that an additional investigation had demonstrated that certain arguments it had advanced based on the report were not supportable. (*Id*.; D.E. 57, April 13, 2021 Suppression Hearing Transcript ("Tr.") 54:17–21.)

First, the letter acknowledged that Ms. Reels had not left the door of her apartment ajar but had instead attempted to close it. (D.E. 48 at 2–3.) To stop her, Detective Priscilla Carabello ("Detective Carabello") placed her "foot and/or hand in the door," and soon after "entered the apartment." (*Id*. at 3.) Second, the Government acknowledged that Detective Audrey Adams ("Detective Adams"), who "picked up the pile of [Defendant's] clothing," had not felt or seen a gun in the Bag while at Ms. Reels' apartment, but had only "felt something heavy, placed it back down, and saw that she had also inadvertently picked up a Gucci fanny pack." (*Id*. at 4.) Although Detective Adams "observed something dark within" the Bag, she "could not identify it." (*Id*.) Nonetheless, Detective Adams "seized" the Bag after Defendant "acknowledged that [it] was his." (*Id*.) Detective Adams only "conducted an inventory search" that located the firearm and narcotics once she returned to the station. (*Id*.) Given these crucial differences, the Government retracted

3

its arguments that the detectives had probable cause to enter Ms. Reels' apartment and that the Bag was "lawfully seized … pursuant to the plain touch and feel doctrines," instead arguing that the Bag was properly searched pursuant to the inventory exception.[1]  (*Id*. at 5.)

Faced with these shifting narratives, this Court held an evidentiary hearing on the Motion on April 13, 2021, hearing argument from counsel and witness testimony from three PPD detectives, two of whom (Detectives Lugo and Adams) participated in executing the arrest warrant at Ms. Reels' apartment.  (D.E. 57.)  Detective Lugo testified that he had written the erroneous Incident Report and suggested that its discrepancies had been honest mistakes based on failures by his colleagues to review the draft report.  (Tr. 56:12–14 (Detective Lugo testifying that he did not remember receiving any input from other detectives regarding the facts in the Incident Report); 60:25–62:23; *see also* Tr. 91:5–9 (Detective Adams testifying that she did not review the Incident Report prepared by Detective Lugo).)  Detective Lugo also averred that the Bag was searched at the station pursuant to standardized inventory procedures.  (Tr. 52:13–53:23; 74:15–77:15.)

As for the specific errors identified in the Government's letter, Detective Lugo testified that, although he was standing next to Detective Carabello at the entrance to Ms. Reels' apartment, he had not seen Detective Carabello put her foot in Ms. Reels' door and had been focused on maintaining his safety due to the noises emanating from the apartment.  (Tr. 46:5–24 (Detective Lugo testifying that, "because [of] the information we received regarding this individual and his background, we were cautious.  We didn't want … to get shot or nothing.").)  Once inside the apartment, Detective Lugo stated that Detective Adams had asked Defendant where his clothes

---

[1] The Government maintains that Defendant lacks standing to challenge the search, alleging that Defendant was merely a short-term guest at Ms. Reels' apartment. (D.E. 48.) In the months that followed the filing of the letter, the parties filed a series of supplemental briefs, largely debating whether Defendant qualified as a short-term guest or an overnight visitor at Ms. Reels' apartment. (D.E. 49, 51, 52.) In one reply, however, Defendant raised two additional arguments: that the search of the Bag was too far removed to be considered incidental to his arrest, (D.E. 52 at 2), and that Ms. Reels' Fourth Amendment rights were violated by the detectives' failure to obtain a search warrant (*id*. at 5).

4

were and Defendant "made a gesture" towards the pile of clothes. (Tr. 49:19–24.) Detective Lugo stated that Detective Adams "picked up the clothes" and proceeded to "grab[] the bag with both hands." (Tr. 50:8–10; 72:6-8.) Detective Lugo also testified that once Detective Adams had the Bag in hand, she stated, "I got it," but that he never saw the Bag opened or a gun or drugs in the apartment. (Tr. 50:6–19; 60:5–61:11.)

Detective Adams, who had entered the apartment through a back entrance, also testified at the hearing. (Tr. 81:22–24.) Her recollection of the arrest largely overlapped with Detective Lugo's testimony. Detective Adams testified that, when she "ask[ed] [Defendant] if he had any clothes," "[h]e gestured with his head to the right." (Tr. 82:18–24.) She saw a pile with "[a] white t-shirt and black pants," and reached down to pick these clothes up with "[o]ne hand." (Tr. 83:4–22.) When the clothing pile was heavier than anticipated, she "put the clothing back down," took the clothes off the top, and revealed "a Gucci fanny pack underneath the clothing." (Tr. 83:24–84:1.) Although the Bag was "partially opened," Detective Adams stated that it "[j]ust looked dark inside," and she could not identify anything specific. (Tr. 86:17–87:4.) She "asked Mr. Brantley" if it was "his fanny pack," to which he "nodded yes." (Tr. 85:3–4.) At that point, she placed the bag on her shoulder, in order to bring it to the station with Defendant. (Tr. 85:7–12.)

Detective Adams insisted that the Incident Report's description of her "feeling" that "there was a gun inside the Gucci bag" was based on the "weight of the bag," the "tip that was given prior to going to the apartment," and her "intuition." (Tr. 88:11–12 (testifying that, upon picking up the Bag, she announced "I have the Gucci fanny pack"); 92:19–93:1; 104:1–3 (testifying she "had no idea what was inside" the Bag); 87:14–15 (testifying she "believed" that "a gun [was] inside" the Bag); 105:3–6.) Detective Adams also testified that she searched the Bag at the station pursuant to standardized policies and procedures because it was Defendant's "property," and she "wanted

5

to make sure" that Defendant would "get back" whatever was in it. (Tr. 96:4–6; 103:14–17.) In addition, she testified in detail regarding the PPD procedures for inventorying arrestees' belongings. (Tr. 96:7–102:15.)

At the conclusion of the hearing, this Court requested post-hearing briefing regarding the propriety of the alleged inventory search and the PPD's inventory search policies and procedures. (D.E. 56.) The Government submitted its supplemental brief on April 21, 2021, and Defendant replied on April 26, 2021. (D.E. 58, 59.)

## II.   DISCUSSION

### A.  Applicable Law

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling" when there is "reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *see United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005). Once the arrest warrant is executed, however, unless an exception applies, it no longer provides justification for law enforcement officers' entry into (or continued presence in) the home. *See Maryland v. Buie*, 494 U.S. 325, 332–33 (1990).

One such exception to the warrant requirement is the inventory search. An inventory search of an arrestee's effects may be excepted from the warrant requirement because it serves "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Colorado v. Bertine*, 479 U.S. 367, 372 (1983); *see also Illinois v. Lafayette,* 462 U.S. 640, 643 (1983). A lawful inventory search must be "'conducted according to standardized criteria' or established routine, consistent with the purpose of a non-investigative search." *United States v. Mundy*, 621 F.3d 283, 287–88 (3d Cir. 2010) (citation omitted); *see also United States v. Thompson*, 29 F.3d 62, 65 (2d Cir.

6

1994). There is no requirement that the inventory procedures be in writing. *United States v. Felder*, Crim. No. 07-540, 2008 WL 2051967, at *4 (E.D. Pa. May 13, 2008) (the "police department's policy and procedure need not be formally written so long as it is standardized …"). "When a person is arrested in a place other than his home," it may be appropriate for the arresting officers to "impound the personal effects that are with [the Defendant] at the time to ensure the safety of those effects or to remove nuisances from the area." *See United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (citation omitted). Nonetheless, an inventory search is not justified if it was merely a pretext for an investigatory purpose, and it "must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Government bears the burden of demonstrating the reasonableness of its actions, *see United States v. Jeffers*, 342 U.S. 48, 51 (1951) (citations omitted), and if its agents acted in bad faith or solely for investigatory purposes, the evidence may be suppressed, *see Florida*, 496 U.S. at 4.

### B. Analysis

As an initial matter, for the purposes of this Motion, this Court accepts that Defendant was more than a short-term guest at Ms. Reels' apartment and thus had standing to challenge any subsequent warrantless search of his belongings. *See Minnesota v. Olson*, 495 U.S. 91, 95–97 (1990). To the extent that the Government suggests that Defendant's "friends with benefits" relationship categorically fails to merit the protections of an "overnight guest," this Court disagrees.[2] (D.E. 51 at 2.) Defendant had asked Ms. Reels for somewhere to stay, arrived at a late hour, and had fallen asleep in Ms. Reels' bed in his underwear. (*See* Tr. 22:25–23:1 (stating that Defendant has "stayed [at Ms. Reels' apartment] twice"); 30:8–17; 66:4–9; D.E. 45-1.) Therefore,

---

[2] The Government relies heavily on *United States v. Rose*, 613 F. App'x 125, 127 (3d Cir. 2015), where a defendant was arrested in the daytime while visiting a friend to attend a cookout, despite the myriad of differences between that scenario and Defendant's intimate overnight stay at Ms. Reels' apartment.

7

a reasonable expectation of privacy could be found, and this Court will move forward in assessing the propriety of the inventory search conducted by the detectives.

To do so, this Court faces the "difficult task of considering a hodgepodge of inconsistent information," and untangling the Government's various narratives. *United States v. Slaughter*, Crim. No. 03-43, 2005 WL 8165165, at *1 (M.D. Pa. Jun. 10, 2005). Further complicating matters, these narratives include strained explanations for the Incident Report's obvious errors.[3] Nonetheless, after hearing extensive testimony regarding the arrest, reviewing the supplemental briefing, and assessing the PPD's inventory policies, this Court concludes that the Government has demonstrated the reasonableness of the Bag seizure.

First, Detective Adams properly identified the Bag as a personal effect belonging to Defendant. The Government acknowledges that the PPD's Search and Seizure and Arrest Transportation and Processing SOPs are "silent on the precise treatment of an arrestee's personal effects (or, even more narrowly how these effects should be treated when an arrestee is apprehended in someone else's residence)." (D.E. 58 at 2.) However, Detectives Lugo and Adams testified that, "under PPD standard practices, when effecting an arrest, the arresting officer impounds the arrestee's effects and inventories them at the police station." (*Id.*) It is undisputed that when Detective Adams picked up the clothing and Bag and asked Defendant if the Bag belonged to him, he acknowledged that it was his. (*See* D.E. 59 at 1 ("Brantley … acknowledged that the Gucci fanny was his property ….")); *see Slaughter*, 2005 WL 8165165, at *4–5 (finding that a bag, identified by a third-party as defendant's, was properly searched). Even if Defendant

---

[3] For example, the Government has attempted to argue that the Incident Report's erroneous description of Detective Adams' ability to "feel" the gun in the Bag remained correct, in essence because it was an emotional, "intuitive" feeling, not a literal one. (D.E. 48; Tr. 92:17–93:1; 105:3–6; *see also* Tr. 59:22–60:1 (Detective Lugo discussing his preparation of the Incident Report and stating, "-- like I said, the way -- what I -- when I was in the apartment and that's what -- I assumed -- I mean, not that I assumed, but that's what I -- I mean, I was there, so whatever -- what happened is what happened. If I wrote it down, then that's what happened.").)

8

had not acknowledged ownership of the Bag, given its location in a pile of men's clothing and the anonymous tip (which had been corroborated in part by Defendant's presence in Ms. Reels' apartment), it may still have been reasonable for Detective Adams to believe the Bag belonged to Defendant without confirmation. (*See* Tr. 85:21–24.)

Nor does Defendant suggest that Detective Adams, or any other detective present that day, rifled through drawers, closed containers, or other rooms in the apartment. (*See*, *e.g.*, D.E. 59.) Further, at all relevant times, Defendant and Detective Adams were in the same room, and when Detective Adams asked Defendant where his clothes were, he clearly identified a pile that included the Bag. (*See* Tr. 49:10–24; 81:25–82:24.) Thus, Defendant has not rebutted the Government's narrative that Detective Adams' actions were permissible.[4] *See United States v. Ellis*, Crim. No. 19-85702, 2020 WL 6784139, at *3 (S.D.N.Y. Nov. 17, 2020).

Second, after identifying the Bag as a personal effect of Defendant's, Detective Adams properly brought it to the station for an inventory search in accordance with established procedures. The record contains uncontested testimony and policies regarding the PPD's procedures for collecting, processing, packaging, and recording items seized during an arrest. (D.E. 58 at 3; D.E. 58, Exs. A, C.) Further, given the anonymous tip, leaving the Bag behind in the unsecured apartment may have amounted to a genuine security risk. Thus, this Court accepts that Detective Adams' actions comported with the regular PPD policy to inventory a defendant's personal belongings that are taken into custody alongside a lawful arrest. (*See* D.E. 58, Ex. A at *533, General Provisions ("If seizures occur, established evidentiary procedures regarding collection,

---

[4] To the extent that Detective Adams' announcement that she had "found the bag" could be interpreted to suggest an investigatory motive, the uncontroverted facts regarding the Bag's retrieval seem to subvert this theory. Moreover, Detective Adams offered a reasonable explanation for this statement, testifying that, as the detectives were concerned for their safety and had received a specific tip regarding the Bag, she was alerting the other detectives that the anonymous tip had been further confirmed. (Tr. 88:13–14 ("According to the tip, that bag possibly contained a gun.").) Thus, there is no reasonable suggestion that the "standard [PPD] procedure[s] ... [were] a pretext [for] concealing an investigatory police motive." *Opperman*, 428 U.S. at 376.

processing, packaging and recordkeeping apply."); *Id.*, Ex. C at 1, Purpose (providing "standardized procedure[s] regarding the documenting and handling of evidence and property that comes into the possession of the" PPD).) Complying with these procedures necessarily requires opening the bag and assessing its contents. (*See id.*, Ex. C at 3-4.)

Third, Defendant provides little in the way of evidence to establish bad faith or a sole investigatory purpose. The "Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches." *Mundy*, 621 F.3d at 294. These standards (and the search warrant requirement) exist to ensure that red flags do not go unscrutinized. However, besides arguing that it is "ridiculous[]" to believe that an "experienced detective confus[ed] a fanny pack with articles of clothing," Defendant does not seem to explicitly allege bad faith on behalf of the detectives, provide evidence contradicting Detectives Lugo and Adams' testimony that the Bag was picked up by accident, or suggest that any broader search was conducted. (D.E. 45 at 5; *see also* D.E. 59.) Thus, while the Government's failure to carefully confirm the information in the Incident Report prior to filing its briefing suggests, at the least, serious sloppiness, there is no real dispute as to how the Bag was located, and there is no suggestion that an improper search was conducted to find it.[5]

To the extent that Defendant argues the detectives should have left the Bag at Ms. Reels' apartment because it "was not in any danger of theft" and did not "create a nuisance in the area," Defendant never denied owning the Bag or asked Detective Adams to put the bag down. (D.E. 59 at 4.) Moreover, it is reasonable to assume that confiscating the Bag, which matched the anonymous tip description, also mitigated security risks and nuisances to the detectives and the

---

[5] It likely goes without saying that, for similar reasons, PPD would have avoided many constitutional questions had it simply obtained a search warrant for the Bag once accidentally stumbling upon it.

10

occupants of Ms. Reels' apartment.[6] (*See* D.E. 45-1 at 5:9–16 (noting that Ms. Reels' sister and young child were present during the arrest)); *see Lafayette*, 462 U.S. at 641–42. Thus, there is insufficient evidence to suggest that the Bag was located solely through investigatory actions that surpassed the warrant's scope.

At bottom, Defendant does not dispute that the Bag was located in a pile of his personal effects or that he acknowledged that the Bag belonged to him. Moreover, PPD provided reasonable regulations relating to inventory procedures, which were followed in this case. Therefore, Defendant's Fourth Amendment rights were not violated when the detectives took the bag from Ms. Reels' residence and subsequently searched it, and suppression would be inappropriate. *See Bertine*, 479 U.S. at 374–76 (evidence seized during an inventory search is admissible if the seizure was conducted in good faith under standardized criteria).

### III.    CONCLUSION

For the reasons set forth above, Defendant's Motion is **DENIED**. An appropriate order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:        Clerk
cc:          Parties

---

[6] Furthermore, "a police expectation that the search will reveal criminal evidence" will not necessarily render the search unreasonable if the search is conducted under standardized procedures. *See United States v. Lopez*, 547 F.3d 364, 372 (2d Cir. 2008). Upon entering the apartment, the detectives may have reasonably held a belief that the Bag could be located on the Defendant's person. But, that fact alone does not demonstrate that the "subsequent inventory search was conducted in bad faith." *See Mundy*, 621 F.3d at 294 ("Such initial observations alone do not suggest that the subsequent inventory search was conducted in bad faith."); *see also United States v. Cecala*, 203 F.3d 836, at *2 (10th Cir. 2000) ("While mixed motives or suspicions undoubtedly exist in many inventory searches, such motives or suspicions alone will not invalidate an otherwise proper inventory search.").